IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| KAYLEE CONLIN,<br><br>Plaintiff,<br><br>vs.<br><br>RU CLIFF, LLC; RIZE HOMESOURCE, LLC; JON NEVIASER; LAW OFFICES OF KIRK A. CULLIMORE, LLC; and KIRK A. CULLIMORE,<br><br>Defendants. | ORDER<br>AND<br>MEMORANDUM DECISION<br><br>Case No. 2:17-cv-1213-TC-DBP |

Plaintiff Kaylee Conlin rented an apartment from Defendants RU Cliff, Rize

Homesource, and Jon Neviaser (the Landlord Defendants). When she brought her dog Buckley

to live in her apartment (Buckley is a companion dog who helps reduce her anxiety), she was

threatened with eviction for violating the lease agreement's no-pet provision and was given

instructions on how to obtain approval to keep Buckley. That approval required completing

forms provided by Defendants Law Offices of Kirk Cullimore and attorney Kirk Cullimore

(Defendants or Cullimore Defendants) to the Landlord Defendants. She ultimately received

approval to keep Buckley, but her lawsuit asserts that the process, and the Cullimore Defendants'

forms that dictated that process, violated her rights under the Fair Housing Act (FHA).

Ms. Conlin asserts seven claims in her complaint, but only three remain because the

Landlord Defendants have been dismissed. The remaining claims—the fourth, fifth, and sixth—

allege disparate impact, disparate treatment, and failure to provide a reasonable accommodation, all in violation of the FHA.

The Cullimore Defendants have moved for summary judgment on those three claims, arguing that they owe no duty to Ms. Conlin under the FHA and that she suffered no harm. Ms. Conlin opposed the motion and filed a motion under Rule 56(d) of the Federal Rules of Civil Procedure asking the court to stay a decision until she could depose the Cullimore Defendants. She also filed a motion for leave to amend her complaint and for an extension of time to file dispositive motions. The court held a hearing on October 30, 2019.

Now, for the reasons set forth below, the Motion for Summary Judgment is GRANTED IN PART AND DENIED IN PART, the Motion for Leave to File Amended Complaint is GRANTED, the Rule 56(d) Motion is DENIED AS MOOT, and the Motion for Extension of Time to File Dispositive Motions is GRANTED.

## RULE 56(D) MOTION

After the Cullimore Defendants filed their summary judgment motion, Ms. Conlin filed her Rule 56(d) Motion to Deny or Defer Consideration of the Cullimore Defendants' Motion for Summary Judgment. She said she could not fully respond to the motion for summary judgment until she had deposed the Cullimore Defendants.

The court was scheduled to hear the motions in July 2019. But the parties agreed to continue the hearing so Ms. Conlin could conduct discovery before opposing the motion for summary judgment. Ms. Conlin took the depositions in June 2019 and the parties filed supplemental briefs on the summary judgment issues. Accordingly, as Ms. Conlin confirmed at the court's October hearing, the Rule 56(d) Motion is moot.

## MOTION FOR SUMMARY JUDGMENT

The Motion for Summary Judgment targets Ms. Conlin's claims under the FHA for disparate impact, disparate treatment, and failure to provide reasonable accommodation.

## Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented." Tabor v. Hilti, Inc., 703 F.3d 1206, 1215 (10th Cir. 2013) (internal quotation omitted)).

"If the movant meets this initial burden, the burden then shifts to the nonmovant to set forth specific facts from which a rational trier of fact could find for the nonmovant." Talley v. Time, Inc., 923 F.3d 878, 893–94 (10th Cir. 2019) (internal quotation omitted). Should the nonmovant bear the burden of persuasion at trial, "[t]hese facts must establish, at a minimum, an inference of the presence of each element essential to the case." Id. (quoting Savant Homes, Inc. v. Collins, 809 F.3d 1133, 1137 (10th Cir. 2016)).

When evaluating a motion for summary judgment, the court must view the facts and draw all reasonable inferences in favor of the non-moving party. Tabor, 703 F.3d at 1215. But this is only true insofar as "there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Id. (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–587 (1986)).

**Ms. Conlin's Claims**

Ms. Conlin's claims concern the lease agreement's written policy about pets and the forms Ms. Conlin's landlord provided to her. The Defendants, who were legal counsel to the landlord, drafted the lease agreement and the three forms, which consist of the "Affidavit and Request for Companion Animal Form," the "Animal Identification Form," and the "Medical Request for Companion Animal." The lease provision titled "Animals" is also at issue. That section sets rules about animals kept by every resident, but also contains specific language addressing companion animals:

> Resident may not keep, allow, or maintain animals of any kind on or near the premises for any length of time without the prior written consent of Owner. For any violation of this provision, in addition to Owner's other remedies, Owner may charge and collect the sum of $50 per day, per violation. All costs of cleaning, de-fleaing or other damage or loss suffered on account of a violation of this section shall be promptly paid to Owner by Resident. Violation of this provision will allow Owner to commence eviction on the basis of nuisance without any further notice or opportunity to cure. <u>Resident is required to get approval for any companion or service animal PRIOR to the animal coming onto the premises. Failure to obtain approval is a significant violation of this agreement which shall allow for immediate eviction.</u> Owner may create and maintain such rules and regulations relating to animals as Owner, in its sole discretion, determines appropriate.

(Residential Rental Agreement at 6–7, ECF No. 93-5 (underline emphasis added).)

On the afternoon of Tuesday, November 24, 2015, Ms. Conlin's landlord, who had just discovered that Buckley was living in the apartment, sent Ms. Conlin an email with the Cullimore Defendants' forms attached and told her to fill out and return the forms to him no later than November 30, 2015. Before he sent her the email, he told her she had three days to vacate the apartment and pay "the full amount of the next seven month's [sic] rent." (Nov. 23, 2015 e-mail from Ms. Conlin to Jon Neviaser, Ex. 8 to Mot. Summ. J., ECF No. 93-8.) He later said that although she still had three days to move out, she only had to pay rent for two months.

The Affidavit and Request for Companion Animal Form required her to swear that she qualified as "handicapped" under the definition provided and that she was or had been "under the care of a medical professional for [her] disability; or have been so diagnosed with a permanent disability to no longer require medical supervision."  (Ex. 2 to Mot. Summ. J., ECF No. 93-2.)  It also required her to confirm that the "requested companion animal is necessary to provide assistance" with her disability, indicate the "anticipated length" of her disability, and provide the name and number of her primary physician.  (Id.)

The Medical Request for Companion Animal Form required her doctor to certify that she is handicapped and agree to testify about that diagnosis in court.  It also analogized the assistance animal to a prescription.

The Animal Identification Form told her to describe "any special training or certification" of Buckley and to state whether he had "ever been reported to authorities for any incident or for any reason."  (Ex. 3 to Mot. Summ. J., ECF No. 93-3.)  She was also told to submit a photograph of Buckley and proof of his vaccinations.

Although Ms. Conlin's landlord gave her six days to complete the forms, that six-day period spanned the Thanksgiving holiday weekend.  Thanksgiving fell on November 26th, just two days after Ms. Conlin was given instructions on how to obtain approval to keep Buckley. And she was required to submit the completed forms by 5:00 p.m. on November 30, 2015, the Monday after the Thanksgiving weekend.

On Monday the 30th, Ms. Conlin responded to the landlord, but she did not provide the forms.  Instead, she provided a note from her physician.  Later that day, the landlord granted Ms. Conlin's request to keep Buckley as a companion animal.  Ultimately she was not required to fill out the forms.

Ms. Conlin asserts that she was harmed when her landlord told her to comply with the requirements set forth in the forms the Cullimore Defendants crafted, copyrighted, promoted, and distributed to landlords (including non-client landlords) throughout the country. According to Ms. Conlin, those documents purposely contained incorrect and misleading information about what the law requires, imposed obligations that went above and beyond what is required by someone seeking approval to have a companion animal, and were designed to intimidate, harass and deter a disabled person requesting a companion animal.

Each of Ms. Conlin's claims against the Cullimore Defendants asserts violations of two FHA provisions: 42 U.S.C. §§ 3604(f)(2) and 3604(f)(3)(B).[1] Claim Four asserts a violation of the FHA for "creating and utilizing forms which are impermissibly burdensome and discriminatory[.]" (Compl. ¶ 64, ECF No. 2.) Claim Five alleges an FHA violation for "creating and requiring forms that require intrusive amounts of information that is unnecessary to evaluate a request for reasonable accommodation." (Id. ¶ 70.) And Claim Six, also alleging a violation of the FHA, says the Defendants are liable for "creating and utilizing forms that contain misleading and inaccurate information regarding reasonable accommodations." (Id. ¶ 76.)

**FHA Provisions at Issue**

        1.   Disparate Treatment and Disparate Impact Under § 3604(f)(2)

The first provision, 42 U.S.C. § 3604(f)(2), says it is unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap[.]"

---

[1] Ms. Conlin, in her supplemental opposition, cites to § 3604(c) for the first time. That provision creates an entirely different basis for liability. In her original complaint, she did not allege a claim under that statute. But in her proposed amended complaint, she expressly alleges a claim under § 3604(c). The Defendants, in their supplemental reply supporting their summary judgment motion, do not address her citation to § 3604(c).

This section imposes liability for intentional discrimination, also called, "disparate treatment," and, alternatively, discriminatory effect, also referred to as "disparate impact." Cinnamon Hills Youth Crisis Ctr. v. Saint George City, 685 F.3d 917, 919 (10th Cir. 2012); Bangerter v. Orem City Corp., 46 F.3d 1491, 1501 (10th Cir. 1995) ("It is widely accepted that an FHAA violation can be demonstrated by either disparate treatment or disparate impact."). "A disparate impact analysis examines a facially-neutral policy or practice, such as a hiring test or zoning law, for its differential impact or effect on a particular group. Disparate treatment analysis, on the other hand, involves differential treatment of similarly situated persons or groups." Bangerter, 46 F.3d at 1501 (quoting Huntington Branch, NAACP v. Town of Huntington, 844 F.2d 926, 933 (2d Cir. 1988)) (emphasis added).

A disparate *impact* claim "doesn't require proof of intentional discrimination." Cinnamon Hills, 685 F.3d at 922. "To prove a case of disparate impact discrimination, the plaintiff must show that a 'specific policy caused a significant disparate effect on a protected group.'" Id. (quoting Reinhart v. Lincoln Cty., 482 F.3d 1225, 1229 (10th Cir. 2007)). "This 'is generally shown by statistical evidence … involv[ing] the appropriate comparables' necessary to create a reasonable inference that any disparate effect identified was caused by the challenged policy and not other causal factors." Id.

On the other hand, a disparate *treatment* claim concerns intentional discrimination. "There are two ways to prove intentional discrimination (or 'disparate treatment')." Id. at 919. The plaintiff may provide direct proof of discriminatory intent, or the plaintiff may point to circumstantial evidence and then apply the burden-shifting framework set out in McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973). Id.

2. Reasonable Accommodation Under § 3604(f)(3)(B)

In addition to prohibiting disparate impact and disparate treatment, the FHA includes a provision—§ 3604(f)(3)(B)— requiring reasonable accommodation of a person's disability. Discrimination on the basis of a "handicap" includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling[.]" 42 U.S.C. § 3604(f)(3)(B).

**Defendants' Opposition**

The Defendants emphasize that Ms. Conlin did not have direct communication with them. They also point out that they did not decide whether to accommodate Ms. Conlin's request to keep Buckley in her apartment. And in a large portion of their briefs, they state that they provided the forms solely in their capacity as legal counsel for the Landlord Defendants.

In their motion, they make the following arguments: (1) the FHA does not impose liability on an attorney for giving legal advice to a client; (2) Ms. Conlin's request for accommodation was granted; (3) she cannot show disparate impact;[2] and (4) she cannot show disparate treatment.[3]

1. Attorney-Client Relationship

Defendants repeatedly emphasize that they cannot be liable under the FHA for advice they gave to their client. But Ms. Conlin expressly states that her claim does not focus on the attorney-client relationship between the Cullimore Defendants and the Landlord Defendants. In

---

[2] Defendants note that Ms. Conlin, in her supplemental opposition, "appears to concede that she suffered no disparate impact." (Suppl. Reply at 2, ECF No. 118.)

[3] Defendants briefly argue that Ms. Conlin "lacks standing to assert liability against the Cullimore Defendants on behalf of anyone but herself." (Suppl. Reply at 9.) It does not appear that she is asserting anything other than her own rights under the FHA.

her supplemental opposition, she explains:

> The Cullimore Defendants dramatically understate what this lawsuit is about. They suggest this case is about whether "attorneys and law firms can be held liable under the FHA [Fair Housing Act] merely for giving legal advice to a landlord." That could not be further from the truth. The Cullimore Defendants have crafted and promoted a <u>national</u> campaign to undermine and interfere with the efforts of disabled individuals to obtain accommodations under the Fair Housing Act. They provide extensive educational "training" to both clients and non-clients through their own marketing efforts, through their alliance with the Utah Apartment Association and through the National Apartment Association.

(Suppl. Opp'n to Mot. Summ. J. at 2, ECF No. 115 (emphasis in original).) Accordingly, the Cullimore Defendants' focus on the attorney-client relationship is not a basis to grant summary judgment.

### 2. Reasonable Accommodation Claim

Based on the record and the pleadings, the court concludes that Ms. Conlin has not established a reasonable accommodation claim under § 3604(f)(3)(B) against the Cullimore Defendants.

> A successful failure-to-accommodate claim has four elements. To prevail, one must prove that (1) he is disabled within the meaning of the FHA, (2) he requested a reasonable accommodation, (3) the requested accommodation was necessary to afford him an opportunity use and enjoy his dwelling, and (4) the defendants refused to make the accommodation.

<u>Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.</u>, 765 F.3d 1277, 1285 (11th Cir. 2014). The Cullimore Defendants note that the Landlord Defendants granted Ms. Conlin's accommodation request just days after she made it. Accordingly, it was not actually denied.

Nevertheless, Ms. Conlin argues that the Cullimore Defendants were responsible for a constructive denial of her request. She says that although she "was not ultimately denied an accommodation, … [she] was not granted a temporary accommodation. … [T]he threat of eviction continued, and Ms. Conlin was told she had only a few days over a holiday weekend to produce the extraneous information demanded in the Forms." (Suppl. Opp'n at 31.)

Constructive denial can be a basis for liability under the FHA. "The failure to make a timely determination after meaningful review amounts to constructive denial of a requested accommodation, 'as an indeterminate delay has the same effect as an outright denial.'" Bhogaita, 756 F.3d at 1286 (quoting Groome Res. Ltd. v. Parish of Jefferson, 234 F.3d 192, 199 (5th Cir. 2000)). See also Scoggins v. Lee's Crossing Homeowners Ass'n, 718 F.3d 262, 271–72 (4th Cir. 2013) (citing Groome, 234 F.3d at 199); Sabal Palm Condos. of Pine Island Ridge Ass'n, Inc. v. Fischer, 6 F. Supp. 3d 1272, 1293 (S.D. Fla. 2014). Ms. Conlin cites to Bhogaita to support her position. But Bhogaita is distinguishable. There the request lay dormant for more than six months, and the Eleventh Circuit found the landlord was not giving the request a meaningful review. Here, the time between the request and the approval was less than a week. The six-day looming threat of eviction and financial hardship was not an "indeterminate delay."

Moreover, regardless of whether there was a constructive denial, her claim makes no sense when asserted against the Cullimore Defendants. The Cullimore Defendants were not in a position to make any decision about Ms. Conlin's request. Accordingly, summary judgment on this claim is granted.

###   3.   Disparate Impact

"To prove a case of disparate impact discrimination, the plaintiff must show that a 'specific policy caused a significant disparate effect on a protected group.'" Cinnamon Hills, 685 F.3d at 922 (quoting Reinhart v. Lincoln Cty., 482 F.3d 1225, 1229 (10th Cir. 2007)). "This 'is generally shown by statistical evidence … involv[ing] the appropriate comparables' necessary to create a reasonable inference that any disparate effect identified was caused by the challenged policy and not other causal factors." Id.

Ms. Conlin has not presented any evidence, statistical or otherwise, that the Cullimore Defendants' actions had a disparate impact on disabled persons. In addition, Ms. Conlin does not address, much less defend, her disparate impact claim in her opposition. Accordingly, the Cullimore Defendants are entitled to summary judgment on this claim.

### 4. Disparate Treatment

To succeed on a disparate treatment claim, a plaintiff must show that the defendant intentionally discriminated against her "in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap[.]" 42 U.S.C. § 3604(f)(2). Defendants argue they are not liable under that section for two reasons. First, they assert that because Ms. Conlin was allowed to keep Buckley, she was not harmed. Second, they contend they did not owe a duty to her under the FHA because they were acting solely in their role as attorneys to Ms. Conlin's landlord, and, in any event, their actions did not cause the alleged harm.

#### a. Harm

Defendants maintain that because Ms. Conlin's landlord promptly granted her request to keep Buckley as a companion animal, she was not harmed. But they define harm too narrowly in the FHA context. The type of harm addressed by Defendants—that is, the denial of the accommodation request—is not the only type of harm recognized under the statute.

Ms. Conlin, citing to United States v. Space Hunters, Inc., 429 F.3d 416 (2d Cir. 2005), notes that the FHA allows recovery for intangible harms. In Space Hunters, the Second Circuit held that the FHA "protect[s] against [the] psychic injury caused by discriminatory statements made in connection with the housing market." Id. at 424–25 (internal quotation marks and citation omitted). Such harms, which are not limited to the type of discriminatory practice in

Space Hunters, include humiliation and emotional distress.  See, e.g., Morgan v. Sec'y of Housing & Urban Dev., 985 F.2d 1451, 1459 (10th Cir. 1993) (recognizing that emotional distress damages may be awarded under the FHA); Steele v. Title Realty Co., 478 F.2d 380, 384 (10th Cir. 1973) (damages suffered as a result of racial discrimination under FHA may include an award for emotional distress and humiliation); Ragin v. Harry Macklowe Real Estate Co., 6 F.3d 898, 907 (2d Cir. 1993) (awarding damages for emotional distress plaintiffs suffered after reviewing discriminatory housing newspaper advertisements); Montano v. Bonnie Brae Convalescent Hosp., Inc., 79 F. Supp. 3d 1120, 1133 (C.D. Cal. 2015) (awarding disabled plaintiff damages for emotional distress and pain and suffering); Parris v. Pappas, 844 F. Supp. 2d 271, 278 (D. Conn. 2012) (awarding damages for emotional distress caused by violation of disabled plaintiff's rights under FHA); Matarese v. Archstone Pentagon City, 795 F. Supp. 2d 402, 445 (E.D. Va. 2011) ("Emotional Distress caused by housing discrimination is a compensatory injury under the FHA."), aff'd in part, vacated in part on other grounds, 468 Fed. App'x 283 (4th Cir. 2012).

Here, Ms. Conlin alleges she suffered emotional distress when she was threatened with eviction, faced potential financial hardship, and was given a short turnaround time to complete the burdensome forms drafted and provided by the Cullimore Defendants.  Given her allegation of an intangible harm, the fact that she was allowed to keep Buckley is not a basis to grant summary judgment to Defendants on her disparate treatment claim.

### b. Duty and Causation

The Cullimore Defendants also assert that because they provided the forms to the Landlord Defendants in their capacity as legal counsel, they did not owe Ms. Conlin a duty and so are not liable.  They further maintain that any action on their part did not cause Ms. Conlin's

alleged harm.

To begin, the court notes that Ms. Conlin does not focus on Defendants' attorney-client relationship with her landlord or the legal advice they gave to their client. She says the issue of duty raised by the Defendants is not relevant.

The court agrees that the issue is not whether the Cullimore Defendants owed Ms. Conlin a duty under the FHA in their capacity as legal advisors. The issue is whether Ms. Conlin is an "aggrieved person" who has the right to bring a private cause of action against the Cullimore Defendants for violating the statute.

The FHA defines "aggrieved person" as anyone who "claims to have been injured by a discriminatory housing practice." 42 U.S.C. § 3602(i). A "discriminatory housing practice" is "an act that is unlawful under section 3604, 3605, 3606, or 3617" of the FHA. Id. § 3602(f).

Courts have treated the question of whether a plaintiff is an "aggrieved person" as a standing issue. The FHA's definition of "aggrieved person" shows "'a congressional intention to define standing as broadly as is permitted by Article III of the Constitution.'" Bank of America Corporation v. City of Miami, 137 S. Ct. 1296, 1303 (2017) (quoting Trafficante v. Metro. Life Ins. Co., 409 U.S. 205, 209 (1972)) (internal quotation marks and citations omitted).

Ms. Conlin claims the Cullimore Defendants injured her by violating § 3604(f)(2). That section prohibits discrimination through "the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap[.]" 42 U.S.C. § 3604(f)(2) (emphasis added). The court finds that the "provision of services" is the most likely avenue for a case of liability against the Cullimore Defendants under the statute.

The FHA does not define "services."  NAACP v. Am. Family Mut. Ins. Co., 978 F.2d 287, 298 (7th Cir. 1992).  But an October 20, 2019 decision by the Eleventh Circuit Court of Appeals contains a limited discussion of case law on the issue and holds that "a service within the meaning of § 3604(b) must be a housing-related service that is directly connected to the sale or rental of a dwelling."  Georgia State Conference of the NAACP v. City of LaGrange, — F.3d —, No. 18-10053, 2019 WL 5076225 at *4 (11th Cir. Oct. 10, 2019) (emphasis added) (holding that provision of water, gas, and electricity utility services was subject to FHA's regulation of the "provision of services" in connection with the sale or rental of a dwelling).

The court, construing the FHA broadly, as it must,[4] concludes that the Cullimore Defendants provided a service directly connected to Ms. Conlin's rental of the apartment.  They drafted, advocated, and provided formulaic, copyrighted, non-proprietary documents to both clients and non-clients.  Those forms filled the landlord's need for rules governing renter requests, such as Ms. Conlin's, for permission to keep an emotional support animal in the apartment.  As such, Ms. Conlin is an aggrieved person who need not independently establish a tort duty on the part of the Defendants.

Still, apart from the question of duty, Defendants contend that Ms. Conlin cannot establish that their actions caused any harm she may have suffered.  To support their position, they cite to Bank of America Corporation v. City of Miami, in which the United States Supreme Court addressed proximate cause in the FHA context.  The chain of causation in Bank of America had many links:

> The City of Miami claims that two banks, Bank of America and Wells Fargo,
> intentionally issued riskier mortgages on less favorable terms to African–

[4] See Trafficante v. Metro. Life Ins. Co., 409 U.S. 205, 209, 212 (1972) ("The language of the FHA is broad and inclusive," and to give effect to the FHA, its language must be given "a generous construction").

American and Latino customers than they issued to similarly situated white, non-Latino customers, in violation of §§ 3604(b) and 3605(a). The City, in amended complaints, alleges that these discriminatory practices have (1) "adversely impacted the racial composition of the City"; (2) "impaired the City's goals to assure racial integration and desegregation"; (3) "frustrate[d] the City's longstanding and active interest in promoting fair housing and securing the benefits of an integrated community"; and (4) disproportionately "cause[d] foreclosures and vacancies in minority communities in Miami." Those foreclosures and vacancies have harmed the City by decreasing "the property value of the foreclosed home as well as the values of other homes in the neighborhood," thereby (a) "reduc[ing] property tax revenues to the City," and (b) forcing the City to spend more on "municipal services that it provided and still must provide to remedy blight and unsafe and dangerous conditions which exist at properties that were foreclosed as a result of [the Banks'] illegal lending practices." The City claims that those practices violate the FHA and that it is entitled to damages for the listed injuries.

137 S. Ct. at 1300–01 (internal citations omitted).

There, the Court held that, "to establish proximate cause under the FHA, a plaintiff must do more than show that its injuries foreseeably flowed from the alleged statutory violation." Id. at 1296. A plaintiff must show "'some direct relation between the injury asserted and the injurious conduct alleged.'" Id. at 1306 (emphasis added) (quoting Holmes v. Sec. Inv'r Prot. Corp., 503 U.S. 258, 268 (1992)). Although the Court found the City was an "aggrieved person," it declined "to draw the precise boundaries of proximate cause under the FHA." Id.

In Ms. Conlin's disparate treatment claim, the level of foreseeability is certainly greater than it was in Bank of America. Although the Cullimore Defendants did not know or interact with Ms. Conlin personally, they understood that the forms and direction they gave to landlords, including the Landlord Defendants, were designed for, and would be presented to, prospective or existing tenants such as Ms. Conlin. Indeed, the Cullimore Defendants could reasonably foresee that Ms. Conlin (or someone else in her position) would be subjected to, and harmed by, the burdensome and misleading forms they drafted and provided to landlords in general.

Because Ms. Conlin was a foreseeable plaintiff, the Cullimore Defendants are responsible

to her under § 3604(f)(2) if she can establish that they violated the FHA by providing services in connection with her lease of the apartment. Accordingly, they are not entitled to summary judgment on the issues of duty and causation.

*c. Conclusion*

Because Ms. Conlin has presented enough evidence on the issues of duty, harm, and causation to avoid summary judgment on her disparate treatment claim, that portion of the Defendants' Motion for Summary Judgment is denied.

## MOTION FOR LEAVE TO FILE AMENDED COMPLAINT

On September 19, 2019, Ms. Conlin moved to amend her November 2017 complaint. In her proposed amended complaint, she drops her "reasonable accommodation" claim under § 3604(f)(3), although she keeps her disparate treatment claim under § 3604(f)(2), and adds five new claims.

The first new claim alleges a violation of 42 U.S.C. § 3604(c). Under that provision, it is a violation of the FHA

> [t]o make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination.

Id.

The remaining four new claims are brought under 42 U.S.C. § 3617, which provides as follows:

> It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title.

Id.

**Relevant Procedural Facts**

This case was filed in November 2017.  The Cullimore Defendants answered the complaint in March 2018, and the initial scheduling order was entered in May 2018.  In that order, the deadline to amend the complaint was June 28, 2018.

In August 2018, the Landlord Defendants filed a motion for summary judgment.  That motion was never resolved because Ms. Conlin, through a settlement agreement, dismissed those defendants in November 2018.

But discovery was ongoing.  On February 14, 2019, Ms. Conlin filed two motions for an order compelling the Cullimore Defendants to respond to discovery requests.  She also had an outstanding February 7, 2019 motion to compel Utah Apartment Association's response to a subpoena *duces tecum*.

The day after Ms. Conlin filed her motions to compel against the Cullimore Defendants, the parties jointly requested an extension of time to complete discovery.  They explained that "[f]act discovery is scheduled to conclude on February 28, 2019, and the parties have outstanding discovery disputes to resolve before Plaintiff may depose the Cullimore Defendants." (Feb. 15, 2019 Stipulation to Amend Scheduling Order & Extend Deadlines at 2, ECF No. 91 (emphasis added).)

The court granted the request and issued the most recent scheduling order (the Third Amended Scheduling Order).  That order extended the fact discovery deadline to May 29, 2019.  But the expired June 28, 2018 deadline to amend pleadings was not renewed.  The dispositive motion deadline date was changed to October 26, 2019.  Pretrial preparation deadlines fall in January 2020, and a trial is set for April 6, 2020.

Despite the Cullimore Defendants' agreement to amend the schedule, only four days after that agreement, they filed their now-pending motion for summary judgment. Ms. Conlin filed her Rule 56(d) motion. Then, at the parties' request, the court vacated the July 2019 hearing date for the summary judgment motion so Ms. Conlin could take the Cullimore Defendants' depositions. Those depositions were taken in June 2019, approximately three months before Ms. Conlin filed her motion for leave to amend.

Defendants point out that the parties discussed amendment of the complaint twice, once in July 2018 and once in March 2019. In July 2018, Ms. Conlin proposed an amendment to the complaint that was limited to "a new claim on a single issue"—i.e., "contacting the doctor as another violation of the Fair Housing Act." (Opp'n to Mot. for Leave to Amend at 1–2, ECF No. 121.) The Cullimore Defendants agreed to the limited amendment, but Ms. Conlin never requested leave to file that proposed amendment.

In March 2019, Ms. Conlin told them she was drafting an amended complaint, but she did not disclose the contents of that amendment to Defendants. And she did not file any motion for leave to amend until six months later, in September 2019, when she submitted the current motion to amend. Nothing indicates that the amendment she was drafting in March 2019 matched the amendment she now proposes or that she had the information she needed to file a request to add the anticipated amendments.

**<u>Standard for Granting Leave to Amend</u>**

Typically, the standard for granting permission to amend a complaint is relatively lenient. "The court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). "The purpose of [Rule 15] is to provide litigants 'the maximum opportunity for each claim to be decided on its merits rather than on procedural niceties.'" <u>Minter v. Prime Equip.</u>

Co., 451 F.3d 1196, 1204 (10th Cir. 2006) (quoting Hardin v. Manitowoc-Forsythe Corp., 691 F.2d 449, 456 (10th Cir. 1982)).

But Ms. Conlin filed her motion after expiration of the June 28, 2018 deadline to amend the complaint. According to the Tenth Circuit, that means the standard under Rule 16(b) also applies: "After a scheduling order deadline, a party seeking leave to amend must demonstrate (1) good cause for seeking modification under Fed. R. Civ. P. 16(b)(4) and (2) satisfaction of the Rule 15(a) standard." Gorsuch, Ltd., B.C. v. Wells Fargo Nat'l Bank Ass'n, 771 F.3d 1230, 1240 (2014) (internal quotation marks and citation omitted) (emphasis added).

Rule 16 provides that a scheduling order "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). "In practice, this standard requires the movant to show the scheduling deadlines cannot be met despite [the movant's] diligent efforts. Rule 16's good cause requirement may be satisfied, for example, if a plaintiff learns new information through discovery or if the underlying law has changed." Gorsuch, 771 F.3d at 1240 (emphasis added).

The Cullimore Defendants, in their opposition to the request for leave to amend, do not raise a futility-of-amendment argument. Instead, they argue that the request to amend comes too late and that amendment would be prejudicial.

Based on a review of the briefs and the record, and for the reasons set forth below, the court finds that Ms. Conlin has satisfied the standards of both Rule 15(a) and Rule 16(b). Accordingly, she is given leave to add the new claims set forth in her proposed amended complaint.

## Undue Delay Under Rule 15(a)

Defendants maintain that Ms. Conlin's request to amend is untimely. The court may

deny the request for permission to amend if there was "undue delay." <u>Minter</u>, 451 F.3d at 1205. But "Rule 15(a) does not restrict a party's ability to amend its pleadings to a particular stage in the action." <u>Id.</u> "Lateness does not of itself justify the denial of the amendment." <u>R.E.B., Inc. v. Ralston Purina Co.</u>, 525 F.2d 749, 751 (10th Cir. 1975), <u>quoted in</u> <u>Minter</u>, 451 F.3d at 1205. Instead, the delay must be "undue," which may be found if the plaintiff was aware of the facts long before filing the motion to amend. <u>Minter</u>, 451 F.3d at 1206.

Ms. Conlin responds that her delay in amending was due to the Defendants' delay in responding to discovery requests. The record bears that out. According to Ms. Conlin, she was waiting for discovery responses from the Cullimore Defendants, both to the written discovery that was the subject of the February 2019 motions to compel, and through the depositions of the Cullimore Defendants, which could not be taken until after resolution of the motions to compel. (Even the Cullimore Defendants, in the Parties' stipulated request for a revision of the schedule, represented that depositions could not be taken until the motions to compel were resolved.) Once the depositions were taken—in June 2019—Ms. Conlin filed her motion for leave to amend, just three months later.

The Defendants maintain that the outstanding discovery disputes concerned information not relevant to the claims she raises now and that she had the information she needed to amend her complaint long ago. In support of their position, they contend that the second motion to compel concerned Defendants' financial condition, which was relevant only to punitive damages. But they do not discuss the focus of the first motion to compel. And Ms. Conlin simply states that relevant information was not available until June 2019: "Based on her depositions of the Cullimore Defendants, Plaintiff discovered additional claims she seeks to assert in her Amended Complaint." (Reply Supp. Mot. Leave to File Am. Compl. at 3, ECF No.

124.)  Defendants have not explained why the first set of discovery requests were not relevant to the claims being asserted now.  And they do not controvert Ms. Conlin's assertion (which is set forth in her attorney's declaration).  Accordingly, the court finds that Ms. Conlin has provided a good reason for the delay.

## Undue Prejudice Under Rule 15(a)

Defendants insist that amendment would prejudice them.  "Courts typically find prejudice when the amendment unfairly affects the defendants 'in terms of preparing their defense to the amendment.'"  <u>Minter</u>, 451 F.3d at 1208 (quoting <u>Patton v. Guyer</u>, 443 F.2d 79, 86 (10th Cir. 1971)).

They assert that if the amendment is permitted, additional briefing will be needed for the motion for summary judgment, which will interfere with pre-trial preparation and the January 24, 2020 deadline for pretrial disclosures.  "Because of the delay in filing the Motion [for Leave to Amend], the Motion for Summary Judgment cannot be heard and decided in a timely fashion, which will result in the parties engaging in pretrial exercises on a case that should be dismissed. This is undue prejudice justifying the denial of the Motion [for Leave to Amend]."  (Opp'n Mot. Leave to Amend at 7, ECF No. 121.)  They do not contend they would have to conduct more discovery to address the factual allegations in the proposed amended complaint or to analyze the legal issues raised by those allegations.

The Tenth Circuit, in <u>Patton v. Guyer</u>, discussed the type of prejudice a party must show to prevent an amendment of a complaint.

> <u>There is invariably some practical prejudice resulting from an amendment, but this is not the test for refusal of an amendment</u>. In this instance the amendment was authorized several months prior to trial. The defendants were not prejudiced in terms of preparing their defense to the amendment. There was practical prejudice also arising from the fact that damages were awarded on the amended count. <u>Had there been no amendment the defendants might have prevailed. This is</u>

not the test. The inquiry again is whether the allowing of the amendment
produced a grave injustice to the defendants.

443 F.2d at 86 (emphasis added).

Defendants plead practical prejudice only. Trial does not begin until April 6, 2020. As
noted below, the court has extended the dispositive motion deadline to allow time to file a
motion challenging the requested amendment. And the issues presented are apparently questions
of law, not facts, which can easily be resolved without more discovery. Moreover, the
Defendants' desire to address those issues in a pre-trial motion will not affect their substantive
ability to defend themselves at trial. There is no "grave injustice" and so no reason to deny leave
to amend based on the prejudice prong of Rule 15(a).

**Good Cause and Diligence Under Rule 16(b)**

The Rule 16(b) standard "requires the movant to show the scheduling deadlines cannot be
met despite [the movant's] diligent efforts." Gorsuch, 771 F.3d at 1240 (internal citation and
quotation marks omitted). This "good cause requirement may be satisfied … if a plaintiff learns
new information through discovery …." Id. If Ms. Conlin "knew of the underlying conduct but
simply failed to raise [her] claims," she has not met the diligence requirement imposed by Rule
16. Husky Venture, Inc. v. B55 Inv., Ltd., 911 F.3d 1000, 1020 (10th Cir. 2018). In addition,
"good cause obligates the moving party to provide an adequate explanation for any delay[.]"
Husky, 911 F.3d at 1020 (internal quotation marks and citation omitted) (emphasis added).

Here, Ms. Conlin asserts that the June 2019 depositions of the Cullimore Defendants
gave her information that was not previously available. This falls within the situation described
by Gorsuch, namely that she obtained new information through discovery.

As for diligence, the delay in taking the depositions was caused by the Defendants. And
Ms. Conlin tried to move the discovery along, as evidenced by her motions to compel.

Moreover, the deadline to amend the complaint expired only one month after the court entered the original scheduling order. That deadline, which occurred two months *before* the fact discovery deadline was set to expire, was simply not realistic. To suggest that Ms. Conlin was not diligent in meeting that deadline would be absurd when the parties and the court jointly expected that fact discovery would end two months after the amendment cut-off. And, later, the parties agreed to extend the fact discovery deadline to May 29, 2019, nine months after the original fact discovery cut-off date and eleven months after the pleading deadline. Under the circumstances, Ms. Conlin was diligent in her efforts to obtain the information through discovery and should not be held to the artificial June 2018 deadline which fell long before discovery was complete.

Ms. Conlin has provided an adequate explanation for the delay and has established that she was diligent in pursuing the information needed. Accordingly, she has satisfied the Rule 16(b) standard.

**Conclusion**

The Defendants have not shown undue delay or undue prejudice. And Ms. Conlin has established good cause for the allowing the proposed amendment at this stage in the litigation. Accordingly, her request for leave to amend is granted.

**MOTION FOR EXTENSION OF TIME TO FILE DISPOSITIVE MOTIONS**

Ms. Conlin asks the court to extend the dispositive motion cut-off by thirty days. Because the court has granted her motion for leave to file an amended complaint, the court grants her request for an extension. It is hereby ordered that the deadline for filing dispositive motions is now Friday, December 6, 2019.

## **ORDER**

For the foregoing reasons, the court ORDERS as follows:

1.      The Cullimore Defendants' Motion for Summary Judgment (ECF No. 93) is GRANTED IN PART AND DENIED IN PART.  Specifically, Claim Four and Claim Six are dismissed with prejudice.  But the Defendants are not entitled to summary judgment on Claim Five.

2.      Ms. Conlin's Motion for Leave to File Amended Complaint (ECF No. 119) is GRANTED.  The court directs her to promptly file the amended complaint.

3.      Ms. Conlin's Rule 56(d) Motion (ECF No. 101) is DENIED AS MOOT.

4.      Ms. Conlin's Motion for Extension of Time to File Dispositive Motions (ECF No. 125) is GRANTED.  The parties may file dispositive motions no later than Friday, December 6, 2019.

DATED this 6th day of November, 2019.

BY THE COURT:

_Tena Campbell_

TENA CAMPBELL
U.S. District Court Judge