IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| KAYLEE CONLIN,<br><br>                Plaintiff,<br><br>vs.<br><br>THE LAW OFFICES OF KIRK A.<br>CULLIMORE, LLC, and KIRK A.<br>CULLIMORE,<br><br>                Defendants. | ORDER<br>AND<br>MEMORANDUM DECISION<br><br>Case No. 2:17-cv-1213-TC-DBP |

In this Fair Housing Act (FHA)[1] case, Plaintiff Kaylee Conlin, who is disabled, seeks

relief against Defendant Kirk A. Cullimore and his Co-Defendant, The Law Offices of Kirk A.

Cullimore, LLC (collectively "Defendants" or the "Cullimore Defendants").[2]  Defendants drafted

and distributed a lease and forms to landlords, including Ms. Conlin's landlord, along with

instructions on how to handle a tenant request to keep an emotional support animal in the

apartment.  Ms. Conlin asserts that Defendants discriminated against her based on her disability

and interfered with her accommodation request to keep her dog Buckley in her apartment.  The

parties have filed cross-motions for summary judgment.  For the reasons set forth below, the

---

[1] 42 U.S.C. §§ 3601-3619, 3631.

[2] Ms. Conlin originally brought this case against three additional defendants—RU Cliff LLC,
Rize Homesource LLC, and Jon Neviaser—who have since been dismissed based on a settlement
between them and Ms. Conlin.  (See Nov. 18, 2018 Order, ECF No. 83.)

court denies Ms. Conlin's motion for summary judgment and grants the Cullimore Defendants'

motion only in part by dismissing the first, second, third, fifth, and sixth causes of actions.

Based on the court's ruling, only Ms. Conlin's fourth and seventh causes of action, both brought

under § 3617 of the FHA, remain.

### **FACTS**

Plaintiff Kaylee Conlin suffers from anxiety.  To reduce her anxiety, she lives with an

emotional support (or companion) animal, a Great Dane named Buckley.  In their papers, the

Defendants do not dispute that Ms. Conlin is disabled, as that term is used in the FHA context.

In June 2015, Ms. Conlin signed a one-year lease for an apartment at the Cliffside

Apartments.  Rize Homesource LLC was the property management company, and Jon Neviaser

was its representative (collectively the "Landlord Defendants").  Rize was a client of the

Cullimore Defendants, whose legal practice focuses on the representation of rental property

owners and managers.

Rize received the lease document (the Lease) it uses with its tenants from the Cullimore

Defendants, who drafted, copyrighted, and distributed the Lease not only to Ms. Conlin's

landlord but to other landlords throughout the country through national webinars and seminars.

Ms. Conlin complains about two provisions in the Lease, saying they discriminate against

disabled tenants.

The first provision explains the rules about keeping pets in the building:

> Resident may not keep, allow, or maintain animals of any kind on or near the
> premises for any length of time without the prior written consent of Owner.  For
> any violation of this provision, in addition to Owner's other remedies, Owner may
> charge and collect the sum of $50 per day, per violation.  … Violation of this
> provision will allow Owner to commence eviction on the basis of nuisance
> without any further notice or opportunity to cure.  Resident is required to get
> approval for any companion or service animal **PRIOR** to the animal coming into

the premises.  Failure to obtain prior approval is a significant violation of this
agreement which shall allow for immediate eviction.

(Residential Rental Agreement (the Lease) at 6 (emphases in original), attached as Ex. 2 to Dep.

of Kaylee Conlin, ECF No. 137-7.)  She characterizes the second provision—contained in the

"General" section of the Lease—as a discriminatory provision that threatens retaliation for

bringing an FHA claim against the landlord.  This provision, which she calls the "Recovery"

section, dictates that, "[i]n the event Resident brings a claim against Owner or its agents with a

state or federal agency, Owner shall be entitled to recover as against Resident any attorney fees

and/or costs and damages for its time (including an hourly rate for Owner or its agent's time) if

the agency fails to make a finding against Owner."  (Id. at 5.)

After Ms. Conlin signed the Lease and moved in, she brought Buckley, then a puppy, to

live with her.  She did so without Rize's knowledge or approval.

On Friday, November 20, 2015, Mr. Neviaser discovered that Buckley lived in Ms.

Conlin's apartment.  He told her she had breached the Lease and that she had to either get rid of

Buckley or move out within three days.  He also told her she would be liable for the remaining

seven months' rent and the deposit.  (Dep. of Kaylee Conlin at 80, attached as Tab 2 to Pl.'s Mot.

Summ. J., ECF No. 137-6.)

Ms. Conlin experienced severe anxiety as a result of Mr. Neviaser's mandate.  She

testified at her deposition that she was "hysterical and distraught" for the days immediately

following her conversation with Mr. Neviaser.  (Id. at 83.)

On Monday, November 23, 2015, she requested an accommodation under the FHA in an

email to Mr. Neviaser.  (Id.)  She told him Buckley was a "comfort animal" and that she was

entitled to keep him in her apartment.  (E-mail from Kaylee Conlin to Jon Neviaser (Nov. 23,

2015, 11:59 a.m.) at p. 4, attached as Ex. 4 to Conlin Dep., ECF No. 137-7 at p. 40.)

The following day (two days before the Thanksgiving holiday), Mr. Neviaser sent Ms. Conlin an email at three o'clock in the afternoon, telling her that "[i]n order to confirm that your situation meets the requirements for a companion animal, we need the attached form filled out by you and your doctor who has provided the prescription for a companion animal."  (E-mail from Jon Neviaser to Kaylee Conlin (Nov. 24, 2015, 3:17 p.m.) at p. 2, attached as Ex. 3 to Dep. of John Neviaser, ECF No. 137-10 at p. 33.)  He attached three forms to the email: "Medical Request for Companion Animal" ("Medical Request"), Affidavit and Request for Companion Animal ("Affidavit"), and Animal Identification Form ("Animal ID Form") (collectively, "the Forms").  (Dep. of Jon Neviaser at 89–90, attached as Tab 3 to Pl.'s Mot. Summ. J., ECF No. 137-9; Exs. 4–6 to Neviaser Dep., ECF No. 137-10 at pp. 34–36.)  As with the Lease, the Cullimore Defendants drafted, copyrighted, and distributed the Forms to Rize and other landlords throughout the country.

Mr. Neviaser gave Ms. Conlin until five o'clock Monday evening, November 30th, to provide the documentation (the Thanksgiving weekend was about to start, so he extended the deadline to five days).  Under extreme duress, Ms. Conlin was able to get a note from her doctor on an expedited basis.  On Wednesday, November 25th, her doctor sent her the letter (dated November 24, 2015), which said that Ms. Conlin "suffers from anxiety" and "keeps a pet which helps her emotionally and should be considered a comfort animal."  (Letter from Dr. Tyler Carroll to "Whom it may concern" (Nov. 24, 2015), attached as Ex. 8 to Conlin Dep., ECF No. 139-6.)  Although Ms. Conlin presented the Forms to the doctor, he told her the letter "'will be sufficient for you.'"  (Conlin Dep. at 118:9-13.)  Neither she nor her doctor filled out the Forms or submitted them to Rize.

Ms. Conlin waited until Monday morning, November 30th, to give the letter to Mr. Neviaser. (See E-mail from Kaylee Conlin to Jon Neviaser (Nov. 30, 2015, 10:45 a.m.), attached as Ex. 10 to Defs.' 2d Mot. Summ. J., ECF No. 134-10.) In her deposition, she surmised that she waited because it was a holiday and most of her family was in town. (Conlin Dep. at 137:10-22.) A few hours after Mr. Neviaser received Ms. Conlin's e-mail and the doctor's letter, he responded in an email that "Buckley is approved as your companion animal while you reside at Cliffside." (E-mail from Jon Neviaser to Kaylee Conlin (Nov. 30, 2015, 3:43 p.m.), attached as Ex. 12 to Defs.' 2d Mot. Summ. J., ECF No. 134-12.)

Defendants contend that Ms. Conlin's emotional distress was solely caused by Mr. Neviaser's statement that if she did not remove Buckley from the apartment, she faced eviction and financial penalties. (See Defs.' Mem. Opp'n to Pl.'s Mot. Summ. J. at 8–10, ECF No. 143.) But the record shows Ms. Conlin was also distressed for some period of time between being told she needed to complete the Forms and receiving permission to keep Buckley as a comfort animal.[3] (See Conlin Dep. at 129–30.)

Even though Mr. Neviaser did not see anything improper, inappropriate, suspicious, or out of the ordinary in the doctor's letter, he called the doctor's office asking to talk to the doctor about what he believed was an "incorrect prescription." (See Neviaser Dep. at 107:18-108:20.) He was following the Cullimore Defendants' instruction to Rize and many other landlords to call the healthcare provider after receiving verification of the tenant's need for a companion animal. The record does not clarify whether Mr. Neviaser made the call before he approved Ms. Conlin's

---

[3] The duration and intensity of her emotional distress is a damages issue that is not before the court.

accommodation request.  He left a message questioning the certification, but he never spoke to the doctor.

Despite the fact that Rize granted her request, Ms. Conlin says Rize's use of the Cullimore Defendants' Forms harmed her and that the Cullimore Defendants, by generating the Forms and promoting their use, are the source of that harm.  She contends the "Forms are the primary focus of an active campaign [by the Cullimore Defendants] to dissuade both residents from pursuing reasonable accommodation requests and healthcare providers from providing verification supporting such requests."  (Pl.'s Mot. Summ. J. at 3–4, ECF No. 139.[4])

Ms. Conlin is referring to the Cullimore Defendants' multiple presentations to a nationwide audience about how to handle comfort animal accommodation requests under the Fair Housing Act.  As part of those presentations, the Cullimore Defendants provided copies of the Forms to audience members.  (See, e.g., Oct. 2015 Presentation Slide 11, "Support for Accommodation: *Emotional Support Animal*" (instructing viewer to "Utilize Forms" created by Cullimore Defendants), attached as Ex. 2 to Rule 30(b)(6) Dep. of The Law Offices of Kirk A. Cullimore, L.L.C., ECF No. 137-13).)  She points to three presentations to members of the National Apartment Association (NAA) as examples of that campaign.  Those presentations include an October 2015 webinar entitled "What the What: How to Approach Emotional Support Animal Requests"; a 2017 live presentation in Atlanta, Georgia, during a conference; and a 2018 webinar presented to the Cullimore Defendants' clients entitled "Verification of Assistance Animals."  (See Pl.'s Mot. Summ. J. at p. 8 ¶ 23.)

---

[4] Ms. Conlin filed a redacted motion (ECF No. 137), but the full motion (sealed) can be found on the docket at ECF No. 139.)

As part of the "campaign" described by Ms. Conlin, the Cullimore Defendants encourage housing providers to "educate" healthcare professionals about reasonable accommodation requests by telling them there will be negative consequences when the healthcare provider verifies a disability and need for the animal.  For instance, they have suggested that housing providers tell the healthcare providers that: (1) because landlords may not charge fees for assistance animals, verification of a need for the assistance animal will cause them financial hardship, (2) when the healthcare professional provides verification he will receive follow-up phone calls from housing providers that will take up the professional's time, and (3) the health care provider may need to testify in court about the tenant's need for an assistance animal.

Ms. Conlin asserts that "[t]he Cullimore Defendants are aware that their Forms and calling the healthcare professionals who sign the Forms decreases the number of requests for reasonable accommodation."  (Id. at p. 9 ¶ 26.)  In response, the Cullimore Defendants say that "[t]he decrease described and sought by the Cullimore Defendants refers only to illegitimate requests for reasonable accommodations" and that Mr. Cullimore "only sought to ferret out fraudulent abusers, not legitimate assistance animal requests."  (Defs.' Opp'n Pl.'s Mot. Summ. J. at pp. 4–5 (Response to Pl.'s SOF ¶ 26), ECF No. 143.)

But evidence suggests otherwise.  Ms. Conlin quotes statements Mr. Cullimore made to webinar viewers and members of audiences attending his nationwide training presentations.  At one of the seminars, Mr. Cullimore used the term "plague" to describe tenants' ability to abuse the rules requiring emotional support animal for a disability that is not readily apparent.  (Rule 30(b)(6) Dep. of The Law Offices of Kirk A. Cullimore, L.L.C. at 96–99, ECF No. 137-13.)  The Cullimore Defendants contend that the use of the word "plague" "refers only to the number of

requests, not anything to do with fraud or illegitimacy." (Defs.' Opp'n to Pl.'s Mot. Summ. J. at 11.) But the goal appears to be reduction of requests in general.

At the 2017 NAA seminar, Mr. Cullimore told audience members that by educating healthcare professionals "on what they're doing to us as an industry by signing these forms, we have a higher likelihood of them understanding what they're signing and maybe taking a second thought at signing it just for anybody that walks through the door." (Audio Recording of Kirk Cullimore Presentation at June 2017 NAA Seminar, 20:10 to 20:35, Ex. 4 to Rule 30(b)(6) Dep. of The Law Offices of Kirk A. Cullimore, ECF No. 137-13.) He continued, saying the housing provider should tell the healthcare professional

> that every time they sign one of these [approvals] that somebody's going to be calling them [so that] they may think twice about having to interrupt their day to do that, and we find that to be fairly consistent, that when we call and do the verification the doctor goes "I don't have time to do this" and you say "well I appreciate that but this is part of the process that we have to go through, and by the way every time you sign one you're gonna have to do this" and then they think twice about signing the forms.

(Id. at 20:39 to 21:10.)

Ms. Conlin does not present evidence that Mr. Neviaser or other representatives of Rize viewed the webinar or attended the seminars she highlights. The only evidence that Rize received some sort of instruction from the Defendants comes from Mr. Neviaser, who confirmed that representatives of Rize attended one or more of Defendants' annual one-day training sessions given locally to property management companies such as Rize. (See Neviaser Dep. at 36–38, 41–42, 45–47.) The nature of those trainings is only vaguely described in the record. For instance, Defendants distributed materials to attendees in preparation for those trainings, but neither Mr. Neviaser nor Ms. Conlin describes the materials. (See id. at 37, 47.) And although some of the training topics related to fair housing issues, the record does not reveal whether those topics included comfort animals for disabled tenants. (See id. at 38, 40, 43, 45.)

According to Ms. Conlin, the Cullimore Defendants, through these trainings, are "attempting to limit financial losses and financial burdens to their clients as a result of the inability to collect pet rentals and pet deposits from people who are granted accommodations for their animals."  (Pl.'s Mot. Summ. J. SOF ¶ 32, ECF No. 139.)  She says this agenda, accomplished by distribution of the Lease and the Forms, as well as instructions to housing providers, targeted legitimate accommodation requests such as hers, in violation of the FHA.

## ANALYSIS

Ms. Conlin has filed a motion seeking summary judgment on all seven of her claims, although she does not ask the court to assess damages.  She reserves that issue for a later date.

In her first cause of action, brought under § 3604(c), she alleges that the Cullimore Defendants published statements in the Lease conveying the message that disabled persons were not welcome at the apartment.  Her second and third causes of action assert that the Defendants violated § 3604(f)(2) because the Lease and the Forms discriminate against a handicapped individual.  And in her fourth through seventh claims, she says Defendants violated § 3617 of the FHA by interfering with or threatening retaliation for exercise of her rights under the FHA in four ways: (1) drafting and distributing misleading and overburdensome Forms designed to discourage all accommodation requests, whether legitimate or not; (2) drafting and distributing the "Recovery" section of the Lease, which contains language threatening retaliation for bringing a claim under the FHA; (3) instructing landlords, in this case Mr. Neviaser, to call the doctor and question the certification; and (4) conducting a national campaign to thwart valid accommodation requests.

In response, the Cullimore Defendants ask the court to enter judgment in their favor. They assert Ms. Conlin has not established that their actions proximately caused any harm she

may have suffered.  They say the terms of the Lease are not discriminatory.  And they argue that

they were providing legal advice to Rize, their client, and because the FHA does not impose

liability for giving legal advice, Ms. Conlin's claims must be dismissed.

The court will address the first two arguments raised by the Cullimore Defendants

throughout its analysis of Ms. Conlin's seven causes of action.  But the court declines to address

the third point, which was rejected in an earlier order addressing their first motion for summary

judgment.

**Defendants' Request for Reconsideration**

In their first motion for summary judgment (filed in February 2019), Defendants raised

the "legal advice" issue and asked the court to dismiss the claims because they were providing

legal services exempt from FHA regulation.  (See Defs.' Mot. Summ. J. at 3, ECF No. 93.)  The

court denied their request for dismissal in a November 2019 order because Ms. Conlin's original

complaint (which has since been amended) did not focus on the attorney-client relationship

between the Cullimore Defendants and Ms. Conlin's landlord.  (See Nov. 6, 2019 Order & Mem.

Decision at 9, ECF No. 129.)  Ms. Conlin, in her opposition to that argument, explained:

> The Cullimore Defendants dramatically understate what this lawsuit is about.
> They suggest this case is about whether "attorneys and law firms can be held
> liable under the FHA [Fair Housing Act] merely for giving legal advice to a
> landlord." That could not be further from the truth. The Cullimore Defendants
> have crafted and promoted a national campaign to undermine and interfere with
> the efforts of disabled individuals to obtain accommodations under the Fair
> Housing Act. They provide extensive educational "training" to both clients and
> non-clients through their own marketing efforts, through their alliance with the
> Utah Apartment Association and through the National Apartment Association.

(Pl.'s Suppl. Opp'n to Mot. Summ. J. at 2, ECF No. 115 (emphasis in original).)  Ms. Conlin was

referring to the "national campaign" that she targets in her Seventh Cause of Action.

The Cullimore Defendants now ask the court to reconsider its decision on that issue.  (See

Defs.' 2d Mot. Summ. J. at 2 n.1, ECF No. 134.)  The court declines to do so.  Nothing has

changed since the order was issued even though the complaint has been amended.  The

Defendants simply repeat the argument already rejected by the court.  And, importantly, the

court rejected the argument because it had no relevance to the claims Ms. Conlin was bringing

(i.e., she was not challenging actions taken in connection with an attorney-client relationship).

The court did not address the merits of the "legal advice" issue and will not do so now.

Upon review of the other issues raised by Defendants, and for the reasons set forth below,

the court dismisses Ms. Conlin's first, second, third, fifth, and sixth causes of action and denies

both parties' requests for summary judgment on Ms. Conlin's fourth and seventh causes of

action.

**Standard of Review for Motions for Summary Judgment**

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a).  "A fact is 'material' if, under the governing law, it could have an effect on the

outcome of the lawsuit. A dispute over a material fact is 'genuine' if a rational jury could find in

favor of the nonmoving party on the evidence presented." Tabor v. Hilti, Inc., 703 F.3d 1206,

1215 (10th Cir. 2013) (internal quotation omitted)).

"If the movant meets this initial burden, the burden then shifts to the nonmovant to set

forth specific facts from which a rational trier of fact could find for the nonmovant."  Talley v.

Time, Inc., 923 F.3d 878, 893–94 (10th Cir. 2019) (internal quotation omitted). Should the

nonmovant bear the burden of persuasion at trial, "[t]hese facts must establish, at a minimum, an

inference of the presence of each element essential to the case."  Id. (quoting Savant Homes, Inc.

v. Collins, 809 F.3d 1133, 1137 (10th Cir. 2016)).

When evaluating a motion for summary judgment, the court must view the facts and draw all reasonable inferences in favor of the non-moving party.  Tabor, 703 F.3d at 1215.  But this is only true insofar as "there is a 'genuine' dispute as to those facts."  Scott v. Harris, 550 U.S. 372, 380 (2007).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Id. (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–587 (1986)).

### Claims of Discrimination Under § 3604(c)

Ms. Conlin's First Cause of Action alleges a violation of 42 U.S.C. § 3604(c), and its implementing regulation, 24 C.F.R. § 100.75(a) (containing identical language).  Under that section, it is unlawful to

> make, print, or publish or caused to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on … handicap … or an intention to make any such preference, limitation, or discrimination.

42 U.S.C. § 3604(c).

According to Ms. Conlin, the Cullimore Defendants violated § 3604(c) because they "made, printed, and published discriminatory statements in the Lease." (Pl.'s Mot. Summ. J. at 13.)  Specifically, she asserts that she was harmed by two "statements" in the Lease.  First, she points to the following language in the "Animals" section of the Lease: "Resident is required to get approval for any companion or service animal **PRIOR** to the animal coming onto the premises.  Failure to obtain prior approval is a significant violation of this agreement which shall allow for immediate eviction."  (Lease at 6.)  This, she says, expresses a bias against disabled persons.  The other statement she challenges—the "Recovery" language—is set forth in the "General" section of the Lease:

> In the event Resident brings a claim against Owner or its agents with a state or federal agency, Owner shall be entitled to recover as against Resident any

> attorney fees and/or costs and damages for its time (including an hourly rate for
> Owner or its agent's time) if the agency fails to make a finding against Owner.

(Id. at 5 (emphasis added).)  She interprets that language to mean the landlord will retaliate

against a disabled resident if the resident files an unsuccessful claim under the FHA.  The

language, she says, indicates hostility toward disabled persons.

Defendants raise two defenses.  First, they contend the Lease does not contain

"statements" as that term is used in § 3604(c).  Second, they raise a causation issue, arguing that

Ms. Conlin has not established that the Defendants' drafting and distribution of the Lease

proximately caused any harm she may have suffered under § 3604(c).

The court does not reach the merits of Ms. Conlin's § 3604(c) claim.  Viewing the

undisputed facts in light of the Tenth Circuit decision in Wilson v. Glenwood Intermountain

Properties, Inc., 98 F.3d 590 (10th Cir. 1996), the court holds that Ms. Conlin does not have

standing to bring a claim under § 3604(c) because she has not suffered an injury § 3604(c) was

designed to redress.

Ms. Conlin asserts that she has established harm because she is indisputably an

"aggrieved person" under the FHA.[5]  But an "aggrieved person" must also establish Article III

standing to bring a claim under the FHA.  Thompson v. N. Am. Stainless, LP, 562 U.S. 170, 176

(2011); Trafficante v. Metro. Life Ins. Co., 409 U.S. 205, 209 (1972).  To have Article III

standing, Ms. Conlin "must have (1) suffered an injury in fact, (2) that is fairly traceable to the

challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial

decision." Spokeo, Inc. v. Robins, ––– U.S. ––––, 136 S. Ct. 1540, 1547, 194 L. Ed. 2d 635

(2016).

---

[5] See 42 U.S.C. § 3602(i)(1) ("Aggrieved person" includes any person who … claims to have
been injured by a discriminatory housing practice").

Article III standing is jurisdictional and cannot be waived.  Wilson, 98 F.3d at 592.

Accordingly, "where the record reveals a colorable standing issue, [the court has] a duty to

undertake an independent examination (sua sponte if necessary) of that issue," even if the parties

do not raise it.  In re Peeples, 880 F.3d 1207, 1212 (10th Cir. 2018) (internal citations and

quotation marks omitted).

In Wilson, the Tenth Circuit addressed the requirements for standing under Section

3604(c).  In that case, the plaintiffs read advertisements that expressly indicated a gender

requirement for residents of the advertised apartments.  Based on that, they asserted they were

injured by reading the discriminatory advertisements.

Despite the fact that the plaintiffs of one gender viewed ads requiring a tenant to be a

different gender, the Tenth Circuit held they did not have standing.  Notably, they "did not allege

any other injury stemming from the advertisements."  Wilson, 98 F.3d at 595.  The Tenth Circuit

held that "mere receipt of the advertisements is [not] sufficient to confer standing" and "could

cause only the kind of 'abstract stigmatic injury' held insufficient to establish standing in [Allen

v. Wright, 468 U.S. 737 (1984)]."  Id. at 595–96.  The appellate court found it important that the

plaintiffs "did not allege the advertisements deterred them from seeking to rent the apartments; in

fact, they applied to rent them."  Id. at 595.

The facts here are similar.  Ms. Conlin reviewed the Lease (including the language she

flags) before she applied for the apartment, signed the Lease, and moved in.  Just as the plaintiffs

in Wilson were not deterred, Ms. Conlin was not deterred by the language she highlights.  Nor

has she presented evidence that she was distressed by the provisions in the Lease when she

applied for the apartment, before she signed it, or when she was a tenant of Rize.

Nothing in the record shows, or even suggests, that she was affected by the language of the Lease when she applied for the apartment.  And, as stressed in <u>Wilson</u>, even if she, as a disabled person, suffered a stigmatic effect from the allegedly discriminatory language, that is not enough.

Because Ms. Conlin does not have standing to bring a claim under § 3604(c), the court dismisses her First Cause of Action.

### Discrimination Claims Brought Under § 3604(f)(2)

Ms. Conlin brings two causes of action under § 3604(f)(2)(A), which prohibits discrimination "against any person in the terms, conditions, or privileges in the sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of … that person…."  In the first of those two claims, she asserts that the Lease's "Animals" section discriminates because it imposes different penalties on a disabled tenant who violates the no-animals rule.  In the other claim, Ms. Conlin contends that the required Forms discriminate because they require a disabled person to go through a burdensome process to get approval to keep an assistance animal in her apartment.

For the reasons set forth below, the court grants the Cullimore Defendants' motion for summary judgment on the § 3604(f) claims because neither the Lease nor the Forms are discriminatory.  The Lease's language does not impose more onerous penalties on a disabled tenant.  As for the claim that the Forms discriminate, Ms. Conlin has not provided evidence that the process a non-disabled tenant must follow to get permission for a pet is somehow different or less burdensome.  Also, the Forms are, by their very nature, irrelevant to non-disabled tenants who would not be requesting an accommodation under the FHA.  Because the non-disabled tenants are not similarly situated, there is no disparate treatment.

### 1.  Language of the Lease

Ms. Conlin points to the following language in the Lease and contends that it imposes

stricter penalties on disabled tenants for violation of the prohibition on pets:

> Resident may not keep, allow, or maintain animals of any kind on or near the
> premises for any length of time without the prior written consent of Owner.  For
> any violation of this provision, in addition to Owner's other remedies, Owner may
> charge and collect the sum of $50 per day, per violation. … Violation of this
> provision will allow Owner to commence eviction on the basis of nuisance
> without any further notice or opportunity to cure.  Resident is required to get
> approval for any companion or service animal **PRIOR** to the animal coming into
> the premises.  Failure to obtain prior approval is a significant violation of this
> agreement which shall allow for immediate eviction.

(Lease at 6 (emphasis in original).) She alleges that the "Prior Approval" language in the Lease

"indisputably establishes an explicitly different penalty – 'immediate eviction' – for disabled

persons with assistance animals."  (Pl.'s Mot. Summ. J. at 15.)

Defendants respond that the Lease is not discriminatory because it allows the landlord to

choose a variety of sanctions against any resident, that the sanctions are the same, and that no

sanction is unique to a person with a comfort animal.  The court agrees.

The language gives the landlord discretion to impose daily monetary penalties whether or

not the animal is a companion animal: "For any violation of this provision, in addition to

Owner's other remedies, Owner may charge and collect the sum of $50 per day, per violation."

(Lease at 6 (emphasis added).)  And although the section addressing the pet prohibition for

tenants in general is worded differently than the portion specific to requests for accommodation,

the practical effect of both phrases threatening eviction is the same, as explained below.

The deliberate word choice suggests a stricter rule and stronger penalty for disabled

tenants.  Failure to get pre-approval of a companion animal "shall allow for immediate eviction."

(Id. (emphasis added).)  "Immediate," understood in the usual sense (i.e., instant), gives the

impression that the disabled tenant would have to leave as soon as the lease violation was

discovered.  The Lease's language applying to pet requests that are unrelated to a disability says a violation of that provision "<u>will allow</u> Owner to <u>commence eviction</u> on the basis of nuisance <u>without any further notice or opportunity to cure</u>."  (<u>Id.</u> (emphasis added).)  The term "commence" suggests some time must pass before the tenant is required to leave.

But every tenant subject to the Lease's requirements has identical rights under Utah's eviction law.  Despite the Lease's language differences, the landlord must, as a matter of Utah law, follow the same eviction process for each resident, whether that resident is disabled or not.

Utah Code prohibits a landlord from removing any renter from that person's apartment without judicial process.  The use of the word "immediate," even if one interprets it to mean "instant," does not change Utah's rules concerning eviction.  "It is unlawful for an owner to willfully exclude a tenant from the tenant's premises in any manner except by judicial process[.]" Utah Code Ann. § 78B-6-814 (2020).  That process requires a landlord who discovers a lease violation to (a) give "three calendar days' notice to quit" and (b) obtain a court order giving it the right to force the tenant to leave.  <u>Id.</u> §§ 78B-6-814, -802(c)-(h).  In other words, Rize would not be able to immediately remove a disabled tenant from the apartment for a lease violation such as Ms. Conlin's failure to obtain approval to keep Buckley.

The issue raised by Ms. Conlin's second cause of action under § 3604(f)(2) is whether the Lease's penalties provision actually discriminates, not whether the Lease's language gives the appearance of discriminating or improperly favoring one resident over another based on disability.  Indeed, Ms. Conlin, in her challenge to the Lease, highlights the nature of the penalty itself, not the appearance of preference (which she addresses in her other claims).

Because the same rules apply to each tenant who violates the "Animals" provision in the Lease, Ms. Conlin has not established that the Lease violates § 3604(f)(2).  Accordingly, the

court grants the Cullimore Defendants' request for summary judgment on Ms. Conlin's Second Cause of Action.

### 2.  The Forms

In her Third Cause of Action, Ms. Conlin alleges that the Forms are deliberately and illegally overburdensome because they "make false statements, ask for improper information, contain misleading and improper terms and verbiage, and are generally and obviously designed and drafted to cause anyone receiving the forms to abandon their efforts to obtain an accommodation." (Pl.'s Mot. Summ. J. at 30.)  And, she says, because the Cullimore Defendants drafted, distributed and directed landlords to use the overly burdensome Forms when a tenant requests an accommodation under the FHA, they violated § 3604(f)(2), which bars disparate treatment on the basis of disability.

In her motion, Ms. Conlin cites to a 2015 non-binding and unsigned charge of discrimination issued by the Housing and Urban Development agency (HUD).  See HUD v. Christensen, FHEO No. 08-14-0066-8 (July 15, 2015) (regarding housing sought at "Viking Villas" apartments) (attached as Ex. 5 to Pl.'s Mot. Summ. J., ECF No. 137-14).  She does not cite to any other authority to support her claim.

In the HUD case (hereinafter "Viking Villas"), the landlord required the renter to complete a "Companion Animal accommodation agreement," to which she was supposed to "attach the verification of [her] animal's proper current inoculations from the vet, and verification of [her] animal's licensure with the city[.]" Viking Villas at p. 4 ¶ 21.  The landlord also required the renter to agree to the terms of the "Companion Animal / Pet Policy Agreement" (CA/PPA).  Those terms included:

> (1) allowing the Landlord to revoke approval of assistance animals at their "sole discretion;" (2) requiring annual submission of evidence that animal is receiving

18

proper veterinarian care; (3) imposing size, weight, and breed limitations on assistance animals; (4) requiring that assistance animals be more than six months old at the time of move-in; (5) allowing the landlord to enter the apartment with notice to inspect for damage suspected to have been caused by the assistance animal; (6) imposing a $25 fine for a one-time failure to immediately remove waste and a requirement that a tenant must have a "doggie bag" available for inspection when outside with her dog; and (7) allowing the landlord to evict tenants for failure to comply with any of the eight provisions of the CA/PPA.

Id. at pp. 4–5 ¶ 22.

The renter alleged that the landlord violated multiple provisions of the FHA for that and other conduct. Of relevance here is the disabled tenant's claim that the landlord violated § 3604(f)(2) by requiring her to comply with the terms of the "Companion Animal accommodation agreement" and the CA/PPA. HUD agreed with the tenant and issued its decision, without written analysis, summarily concluding that the mandatory terms were burdensome and discriminatory. Id. at p. 4 ¶ 22, pp. 5–6 ¶¶ 22, 28.

Although Viking Villas addresses a factual scenario similar in some respects to the facts upon which Ms. Conlin bases her claim, the court does not find the decision helpful. First, it is an agency's charge of discrimination, not a decision issued by a court. Second, the decision does not address the meaning of the term "discriminate" in the context of § 3604(f)(2), and HUD's finding appears to be inconsistent with courts' interpretation of the requirements for a claim of disparate treatment under § 3604(f)(2).

To make out a prima facie case of discrimination based on disparate treatment, Ms. Conlin must show that she is a member of a protected class (that is undisputed here), that she suffered an adverse action (i.e., her allegation that she was subjected to overburdensome forms and unnecessary requirements to obtain an accommodation), and, importantly, that she was treated differently than similarly-situated persons on account of her disability. Payan v. United

Parcel Serv., 905 F.3d 1162, 1168 (10th Cir. 2018);[6] Cinnamon Hills Youth Crisis Ctr., Inc. v.

St. George City, 685 F.3d 917, 920 (10th Cir. 2012) (prima facie case of discrimination under

FHA requires disparate treatment of similarly-situated individuals); Bangerter v. Orem City

Corp., 46 F.3d 1491, 1501 (10th Cir. 1995) ("'Disparate treatment analysis [under the FAA] …

involves differential treatment of similarly situated persons or groups.'") (quoting Huntington

Branch, NAACP v. Town of Huntington, 844 F.2d 926, 933 (2d Cir. 1988)); Sanders v. SWS

Hilltop, LLC, 309 F. Supp. 3d 877, 881 (D. Or. 2018) ("An individual suffers disparate treatment

[under the FHA] when he or she is singled out and treated less favorably than others similarly

situated on account of his or her disability.") (internal quotation marks and citation omitted).

Ms. Conlin does not identify how the use and content of the forms resulted in disparate

treatment.  She discusses how the forms misstate the law and are misleading, overburdensome,

and unnecessary.  Those concerns are certainly relevant to her claim under § 3617, discussed

below.

But in a § 3604(f)(2) discrimination claim, the Forms are just one part of the equation.

There must be a comparison—that is, a showing that she was treated less favorably than

similarly situated individuals when she was told to fill out the Forms as part of her

accommodation request.  Yet she does not make any comparisons.

Perhaps the unidentified similarly-situated parties would be the non-disabled tenants

who request permission to keep a pet.  But such an analysis would compare apples to oranges. A

non-disabled resident would not, by definition, need to make a request for an accommodation

---

[6] Although Payan is a Title VII employment discrimination case, the Tenth Circuit looks to such
cases for guidance when evaluating FHA discrimination claims.  Honce v. Vigil, 1 F.3d 1085,
1088 (10th Cir. 1993) (courts addressing FHA discrimination claims look to Title VII
employment discrimination cases for guidance).

under the FHA.  A disabled resident by law must make a request.  The legal standards are different.  For that reason alone, Ms. Conlin and her non-disabled co-tenants were not similarly situated when it comes to the Forms.

But even if the court were to find they were similarly situated, the record does not show what requirements, if any, a non-disabled tenant must satisfy in order to get permission in the first place.  And the Lease is silent on that point.  As for restrictions and obligations imposed on a disabled resident <u>after</u> she receives the accommodation (the Forms, although meant to get approval of a request, also list post-accommodation restrictions), nothing in the record shows what rules, if any, a non-disabled resident with permission to keep a pet would need to follow in order to retain that permission.

Because the court has nothing to compare, the court cannot evaluate whether use of the Forms was discriminatory.  In essence, Ms. Conlin's claim does not fit within the rubric of a § 3604(f)(2) cause of action.  Because Ms. Conlin has not established a prima facie case that the Forms discriminated against her in violation of § 3604(f)(2), the Defendants are entitled to summary judgment on her Third Cause of Action.

### Claims Under § 3617

Ms. Conlin brings her Fourth through Seventh Causes of Action under Section 3617, which provides that "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of or on account of his having exercised or enjoyed, … any right granted or protected by section 3603, 3604, 3605, or 3606 of this title."[7]  To establish a

---

[7] The implementing regulation similarly provides that a person violates the Act by "threatening, intimidating or interfering with persons in their enjoyment of a dwelling because of the … handicap … of such persons …." 24 C.F.R. § 100.400(c)(2).

21

prima facie claim under § 3617, Ms. Conlin must show that

> (1) she is a protected individual under the FHA, (2) she was engaged in the
> exercise or enjoyment of her fair housing rights, (3) the defendants coerced,
> threatened, intimidated, or interfered with the plaintiff on account of her protected
> activity under the FHA, and (4) the defendants were motivated by an intent to
> discriminate.

Bloch v. Frischholz, 587 F.3d 771, 783 (7th Cir. 2009); Zhu v. Countrywide Realty, Co., Inc.,

165 F. Supp. 2d 1181, 1196 (D. Kan. 2001).

In her Fourth Cause of Action, Ms. Conlin challenges the Forms.  Her Fifth Cause of

Action focuses on the "Recovery" portion of the Lease (alleged to threaten retaliation for

bringing an action under the FHA).  In her Sixth Cause of Action, she asserts that the landlord's

call to Ms. Conlin's physician, which he made as a result of Defendants' instructions on how to

handle accommodation requests, violated § 3617.  And in her Seventh Cause of Action, she

contends the Defendants' national "campaign" to discourage comfort animal accommodation

requests is an independent violation of § 3617.

Before analyzing the merits of Ms. Conlin's § 3617 claims, the court addresses

Defendants' argument that when a plaintiff's claim under § 3604 is unsuccessful, § 3617 does

not provide a separate cause of action.  The Defendants point to language in § 3617 saying a

right under § 3604 is protected by § 3617 from coercion, intimidation, threats, or interference.

From that, they argue that "because [Ms.] Conlin has failed to demonstrate how the Lease

prevented her from enjoying her rights under Section 3604 (and has not alleged a violation of

Section 3603, 3605, or 3606), her claim under Section 3617 necessarily fails."  (Defs.' Opp'n to

Pl.'s Mot. Summ. J. at 16.)  The court disagrees.

Although the Tenth Circuit has not addressed the issue raised by the Defendants,

numerous jurisdictions have determined that a plaintiff's failure to establish discrimination under

§ 3604 does not foreclose her ability to recover under § 3617.  To find otherwise, they say,

would render § 3617 useless.  See Bloch v. Frischholz, 587 F.3d 771,782 (7th Cir. 2009); Revock v. Cowpet Bay W. Condo. Ass'n, 853 F.3d 96, 112 (3d Cir. 2017); Hidden Vill. LLC v. City of Lakewood, Ohio, 734 F.3d 519, 528 (6th Cir. 2013).  The court finds those cases persuasive.  Accordingly, even though Ms. Conlin has not prevailed on her § 3604 causes of action, the court will review the merits of her § 3617 claims.

## 1.  The Forms

Ms. Conlin alleges that the Defendants violated § 3617 by creating and distributing overburdensome, unnecessary, and misleading Forms to landlords for use when an accommodation request has been made.  The Forms, she alleges, "require intrusive amounts of information that is unnecessary to evaluate a request for reasonable accommodation in an effort to preclude the grant of a reasonable accommodation in violation of the Fair Housing Act[.]" (Am. Compl. ¶ 97, ECF No. 130.)

Defendants raise a causation defense.  A claim for damages under the FHA is "akin to a tort action," which means a plaintiff must show that her harm was foreseeable and that the defendant's conduct proximately caused that harm.  Bank of Am. Corp. v. City of Miami, 137 S. Ct. 1296, 1305 (2017).  "Proximate cause generally bars suits from alleged harm that is too remote from the defendant's unlawful conduct" and "requires some direct relation between the injury asserted and the injurious conduct alleged."  Id. at 1306 (internal citations and quotation marks omitted).  See also Butterfield v. Okubo, 831 P.2d 97, 106 (Utah 1992) ("Proximate causation is that cause which in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury and without which the result would not have occurred.") (internal citations and quotation marks omitted).

The Cullimore Defendants distributed the Forms to the Landlord Defendants with

23

instructions to use the Forms when a tenant makes an accommodation request for an emotional support animal. When Ms. Conlin made a request, the Landlord Defendants gave her the Forms and told her she was to complete them before she could receive approval. This, she says, caused her great distress and interfered with her enjoyment of the apartment and her exercise of rights under the FHA.

Arguably the Forms present misleading information and ask for a large amount of unnecessary and intrusive information that makes the sum total of their requirements over-burdensome. But the court does not reach that issue because proof of causation is a problem, as discussed below.

The Forms were created in 2014 and replaced by new forms in early 2015, before Ms. Conlin's November 2015 accommodation request. Given the distinct versions, the Defendants refer to the "Forms" as the "Old Forms" and the 2015 forms as the "New Forms." (See "Old Forms" at ECF No. 137-10 and "New Forms" at ECF No. 134-9.)

The Cullimore Defendants maintain they told the Landlord Defendants to disregard the Old Forms and use the New Forms, which had been updated and improved after the Defendants engaged in a conciliation process with HUD. Accordingly, they say, the fact that the Landlord Defendants disregarded that instruction by presenting the Old Forms to Ms. Conlin and causing her emotional distress,[8] means that Ms. Conlin's harm was not foreseeable by the Cullimore Defendants.

---

[8] Defendants cite to Morgan v. Secretary of HUD, 985 F.2d 1451 (10th Cir. 1993), to support their other argument that Ms. Conlin may not recover because her distress was not the type of harm the statute was meant to address. Morgan provides that "emotional distress damages are available in Fair Housing Act cases for distress which exceeds the normal transient and trivial aggravation attendant to securing suitable housing[.]" Id. at 1459. They say Ms. Conlin's distress that she would be evicted and suffer financial hardship was "transient and trivial" and "not beyond normal aggravation" of someone who violates a lease. (Defs.' Opp'n Pl.'s Mot.

Ms. Conlin's briefs, on the other hand, suggest that Defendants' causation argument is not that simple.  According to evidence Ms. Conlin cites in her statement of facts, the record contains contradictory evidence about whether the Cullimore Defendants told the Landlord Defendants not to use the Old Forms.  (See Pl.'s Opp'n to Defs.' Mot. Summ. J. at 10, ECF No. 144.)

Mr. Cullimore states in his December 6, 2019 Declaration that as part of the resolution with HUD, Defendants removed the Old Forms from their secured website in October 2014 and published and posted the New Forms in April 2015.  (Decl. of Kirk Cullimore ¶ 11, attached as Ex. 9 to Defs.' 2d Mot. Summ. J., ECF No. 134-9.)  He also asserts that whenever they met with their clients, they reminded the clients to use the most recent version of the forms on the website.  (Id. ¶ 8.)  Finally, Defendants emphasize that after they created the New Forms, they "sent out an e-mail and a newsletter to all of [Defendants'] clients informing them about the New Forms and specifically directing them to use the New Forms."  (Id. ¶ 12.)  (But see Dep. of Kirk Cullimore at 136:22–137:3, ECF No. 137-2 (testimony suggesting that when the April 2015 version was posted on the website, notice of the New Forms was only put on the firm's website: "[W]e definitely sent out communications to our – you know, on the website that says, 'We have new assistance animal forms.  These are them.  You need to start using them.  If you have any old ones, get rid of them,' and da-da da-da da.  So this is where we really started to communicate with people that these are the forms.").)

---

Summ. J. at 13.)  Their reliance on Morgan is misplaced.  Ms. Conlin was distressed because she was told she needed to complete the Old Forms before she could get permission to keep her comfort animal Buckley and avoid eviction.  That is not "normal" aggravation associated with violation of a lease.

Mr. Neviaser, the Rize representative who gave the Old Forms to Ms. Conlin, testified in his personal deposition that he did not receive any communication from the Cullimore Defendants that the Forms (the "Old Forms") were outdated or that he should not use that version. (Neviaser Dep. at 96:14-97:7.). He said he was under the impression that the "Old Forms" were the most recent forms "[b]ecause no one from Cullimore [sic] office communicated to us that there were any newer forms." (Id. at 96:18-22.)

Q. And you would expect that communication?

A. I would.

Q. So it's your understanding that if Cullimore's office were going to update any of the forms in their online website, I guess, they would send you an email or some notification and say, 'Hey, we have a new form.'?"

A. That's correct.

Q. And did that happen?

A. No.

(Id. at 96:23–97:7.)

Yet when Mr. Neviaser testified as Defendant Rize's corporate representative during the Rule 30(b)(6) Deposition of Rize, he said something different. According to Mr. Neviaser, during a time that included 2015 and 2016 (the "2015–2016 time period" discussed during the Rize Deposition), Rize used the Old Forms at "the beginning of that time period" and that the Old Forms "were updated at some point in that time period, and we started using updated forms." (Rule 30(b)(6) Dep. of Rize Homesource L.L.C. at 108:4-11, ECF No. 144-1.) That timeframe is consistent with Mr. Cullimore's Declaration stating that the New Forms were added to the Firm's website in April 2015. When Mr. Neviaser was asked what caused him to use the

updated forms, he responded that he did it on the "[a]dvice of counsel," who updated the forms

regularly.  (Id. at 108:12-22.)  When asked how Rize would know the forms were updated, he

replied, "Cullimore requests that we go to their website every time we need a form to make sure

we're getting the most recent form."  (Id. at 109:7-9.)  He then clarified that, after Ms. Conlin

submitted her accommodation request, he did not follow that advice and instead grabbed a form

on Rize's computer server because it was "not really logistically functional to download a form

from a website every time we needed it."  (Id. at 109:10-15.)

As the above testimony shows, the record and the parties' papers do not clarify what, if

anything, the Cullimore Defendants communicated to the Landlord Defendants and the other

property management owners about the status and availability of the Forms.  Because this creates

a genuine dispute of material fact concerning causation, the court finds that neither the Cullimore

Defendants nor Ms. Conlin are entitled to summary judgment on the Fourth Cause of Action.

### 2.  The Lease's "Recovery Section"

Ms. Conlin's Fifth Cause of Action focuses on the Lease's "Recovery Section," which

entitles the landlord,

> [i]n the event Resident brings a claim against Owner or its agents with a state or
> federal agency, … to recover as against Resident any attorney fees and/or costs
> and damages for its time (including an hourly rate for Owner or its agent's time)
> if the agency fails to make a finding against Owner.

(Lease at 5.)  She contends that the language, although not specific to the FHA or a disabled

tenant, threatens retaliation if the tenant brings an FHA claim against the landlord.  And, she

says, because the Defendants drafted and distributed the Lease to landlords, their inclusion of the

Recovery Section "interfered with and threatened [her] right to pursue a claim" under the FHA

by creating a chilling effect.  (Pl.'s Mot. Summ. J. at 15–16.)

Even assuming the provision creates a chilling effect, Ms. Conlin has not presented evidence that the provision had a chilling effect on her.  She does not assert that the language distressed her, much less that she changed her behavior because of the provision.  There is no evidence that she planned to bring, or even thought about bringing, an action against the landlord with a state or federal agency but was deterred by the possibility that she would have to pay the landlord's fees, costs, and damages.

Without such evidence, the court cannot find that the Defendants' creation and distribution of the Lease, including the language of the Recovery section, was the proximate cause of any harm she alleges.  See, e.g., Marks v. BLDG Mgmt. Co., Inc., Case No. 99 CIV. 5733(THK), 2002 WL 764473, at *13–*14 (S.D.N.Y. Apr. 26, 2002) (borrowing from First Amendment cases, court held that no evidence of chilling effect on tenant's willingness to assert her FHA rights meant no adverse action and so no harm) (citing Curley v. Vill. of Suffern, 268 F.3d 65, 75 (2d Cir. 2001), Spear v. Town of W. Hartford, 954 F.2d 63, 67 (2d Cir. 1992), and Davis v. Vill. Park II Realty Co., 578 F.2d 461, 464 (2d Cir. 1978)).  Accordingly, Defendants are entitled to summary judgment on Ms. Conlin's Fifth Cause of Action.

### 3. Instructions to Contact the Health Care Provider

In her sixth cause of action, Ms. Conlin focuses on the Cullimore Defendants' instructions to landlords, including Rize and Mr. Neviaser, to contact the healthcare provider upon receiving an accommodation request.  They recommend the landlord contact the provider ostensibly to verify the certification but in truth to carry out the alleged two-fold purpose of the instruction: to obstruct the tenant's request and to discourage, and ultimately reduce, future certification of even legitimate claims that a requesting tenant needs a comfort animal.  They do this by questioning the validity of the certification and suggesting negative consequences will

befall the provider who certifies the need for a comfort animal (for example, suggesting that the person, by certifying the tenant's need for the comfort animal, may spend additional time responding to landlord calls and may have to testify in court).

Ms. Conlin asserts that the Defendants use landlords (or work in tandem with them) to accomplish those goals, and, in doing so, violate § 3617. In particular, her sixth cause of action takes issue with Mr. Neviaser's call to her doctor, which he made due to Defendants' training and instruction.

As noted above, a prima facie case under § 3617 includes proof that "the defendants coerced, threatened, intimidated, or interfered with the plaintiff on account of her protected activity under the FHA[.]" Bloch v. Frischholz, 587 F.3d 771, 783 (7th Cir. 2009). It is not enough to show that the action generally frustrated the process for obtaining a reasonable accommodation. As part of her prima facie case, she must show that Defendants' instructions to contact the provider as part of its campaign,[9] or Mr. Neviaser's call carrying out those instructions, coerced her, threatened her, intimidated her, or interfered with her accommodation request. She has not provided evidence to support that element.

First, the doctor did not rescind the letter, so the call, although made at the behest of the Defendants, did not interfere with Ms. Conlin's accommodation request. The call was aimed at the doctor, and although it could have interfered with her request, it did not have the desired effect in Ms. Conlin's case.

Second, Ms. Conlin does not present evidence that Defendants coerced, threatened, or intimidated her. Arguably Mr. Neviaser's call was an attempt to coerce, threaten, or intimidate

---

[9] Because Ms. Conlin treats the call to the provider as a separate cause of action, the court will not look at whether the overall strategy, of which the call is part, harmed her.

the doctor.  But there is no evidence that Ms. Conlin was aware of the call.  Looking at the plain language of § 3617, the court finds that coercing, threatening, or intimidating the doctor does not satisfy the element.

Because Ms. Conlin has not established an element of her § 3617 prima facie case in connection with the call to the physician, Defendants are entitled to summary judgment on Ms. Conlin's Sixth Cause of Action.

### 4. The National "Campaign"

Ms. Conlin contends the Cullimore Defendants violated § 3617 when they conducted a national campaign—including national trainings and widespread distribution of the Forms and the Lease—for the purpose of instructing housing providers on ways to evade Fair Housing Act requirements, and, ultimately, reducing the number of legitimate accommodation requests. Because she was subjected to many of the methods taught to landlords by the Cullimore Defendants, she says the campaign interfered with her FHA rights.

This claim overlaps with her other § 3617 claims so some of the same considerations and problems apply here.  Those include the timing and nature of communications by the Cullimore Defendants to the Landlord Defendants, the source from which the Landlord Defendants obtained the instructions, the Lease, and the Forms, and causation issues discussed above in the claim about use of the Forms.

Ms. Conlin provides evidence of three seminars that Mr. Cullimore, on behalf of Cullimore Law Offices, gave to a broad audience (clients and non-clients alike, including members of the NAA).  The first, a webinar given in October 2015, was titled "What the What: How to Approach Emotional Support Animal Requests."  (See Ex. 2 to Rule 30(b)(6) Dep. of

The Law Offices of Kirk Cullimore, ECF No. 137-13.)  The other two seminars were given in 2017 and 2018, after Ms. Conlin requested an accommodation.

During the 2015 webinar, Mr. Cullimore presented to members of the NAA.  Many of the actions he recommended to attendees were used in Ms. Conlin's case.  Those included requiring completion of misleading, unnecessary, and burdensome application forms that interfered with the accommodation process, and calling persons (particularly doctors) who verify the tenant's need for a comfort animal to warn that future verifications may result in time-consuming interruptions and obligations.

Defendants note that Ms. Conlin does not provide evidence that any representative of the Landlord Defendants viewed the 2015 webinar.  This, they say, means Ms. Conlin cannot establish that the national training caused her any harm because the Landlord Defendants were not acting based on information presented during that webinar.

But Ms. Conlin's landlord used many of the tactics Defendants recommended to their national audience.  And the record suggests that the webinar was not the only mode the Defendants used to get their message out.  Defendants hold themselves out as experts in landlord/tenant law, including the FHA.  They have made multiple presentations to members of the NAA.  They have annually trained groups of clients (including Rize) on landlord/tenant issues arising under the FHA, including trainings that occurred before Ms. Conlin requested an accommodation.  The fact that Rize representatives may not have attended the 2015 webinar does not foreclose a finding that they attended a similar presentation and acted, at least in part, on training and information the Defendants gave during national and other group trainings.

At the same time, the Cullimore Defendants changed some of their national presentations and forms after the New Forms replaced the Old Forms.  If the Defendants were giving

instructions tempered by their conciliation with HUD, then the question is whether, and if so, when, Ms. Conlin's landlord received corrected instructions and corrected forms through such trainings.  Just as there is a question about the communication, or lack thereof, concerning the Old and New Forms in Ms. Conlin's Fourth Cause of Action, there is a question about whether the landlord's understanding of the overall approach changed, or should have changed, by what the Defendants expressed through trainings and general distribution of materials on FHA accommodation requests.

Without knowing how, when, and where the Landlord Defendants received information about how to approach accommodation requests, and without knowing the content of that information, the court cannot grant summary judgment to Ms. Conlin on this cause of action. Similarly, because the question of causation, at least concerning the Old versus New Forms, remains, the court will not grant the Defendants' motion to dismiss Ms. Conlin's seventh cause of action.

## ORDER

For the foregoing reasons, Ms. Conlin's Motion for Summary Judgment (ECF No. 137 (redacted version) and ECF No. 139 (sealed version)) is DENIED.  The Cullimore Defendants' Second Motion for Summary Judgment (ECF No. 134) is GRANTED as to Ms. Conlin's First, Second, Third, Fifth, and Sixth Causes of Action and DENIED as to Ms. Conlin's Fourth and Seventh Causes of Action.

DATED this 16th day of July, 2020.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
U.S. District Court Judge

32